IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

CHARLES D. GREEN,

      Plaintiff,

v.                                          Case No. 06-3298-SAC

FRANK DENNING, et al.,

      Defendants.


**MEMORANDUM AND ORDER**

This case comes before the court on defendant's motion for summary judgment. (Dk. 72) Plaintiff opposes the motion. Also pending are defendants' motion to strike plaintiff's affidavit (Dk. 82), defendants' motion to strike plaintiff's second response (Dk. 93), and plaintiff's motions for appointment of counsel (Dks. 86, 90, 94 & 97).

**PROCEDURAL BACKGROUND**

This is a civil rights case brought pursuant to 28 U.S.C. § 1983, based upon events which occurred while plaintiff was confined in the Johnson County Adult Detention Center (JCADC) in Olathe, Kansas.

Plaintiff's complaint originally contained five claims, and plaintiff was later granted leave to add a sixth. *See* Dks. 1, 8, 31. Plaintiff additionally added parties. The court subsequently dismissed plaintiff's third (due process) and sixth (retaliation) claims as stating no claim for relief under § 1983 (Dk. 36), and dismissed Prison Health Services as a party (Dk. 84).

Plaintiff's second claim (denial of hormonal treatment) is brought solely against Prison Health Services, so shall be dismissed for failure to state a claim for relief. This leaves the following three claims for resolution: 1) Deputy Polson used excessive force against plaintiff in May of 2005; 2) Major Cortright and Deputy Pierucci continually denied plaintiff's requests for dental floss; and 3) Major Cortright and Deputy Pierucci mishandled plaintiff's legal mail by opening it outside plaintiff's presence. Defendants move for summary judgment on each of these claims, and plaintiff opposes the motion.

**SUMMARY JUDGMENT STANDARD**

Rule 56 authorizes judgment without trial "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c)(2). A material fact is one which would affect the outcome of the claim or defense under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

To counter a "properly made" motion, the non-movant must "set out specific facts showing a genuine issue for trial" by way of admissible evidence in compliance with Rule 56(e)(1). A party faced with a summary judgment motion may not simply rest on allegations contained in the pleadings, but must come forward with admissible evidence establishing each fact he relies upon. *BancOklahoma Mort. Corp. v. Capital Title Co.*, 194

F.3d 1089, 1097 (10th Cir. 1999). To accomplish this, the facts "must be identified by reference to an affidavit, a deposition transcript, or a specific exhibit incorporated therein." *Adams v. American Guarantee and Liability Ins. Co.*, 233 F.3d 1242, 1246 (10th Cir. 2000). Affidavits must be made on personal knowledge and shall set forth such facts as would be admissible in evidence. Fed.R.Civ.P. 56(c)(4).

The nonmoving party's admissible evidence "is to be believed, and all justifiable inferences are to be drawn in [that party's] favor." *Anderson*, 477 U.S. at 255; *MacKenzie v. City & County of Denver*, 414 F.3d 1266, 1273 (10th Cir. 2005). At this stage, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge…." *Anderson*, 477 U.S. at 255. However, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.' " *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). *See Pinkerton v. Colorado Dept. of Transp.*, 563 F.3d 1052, 1058 (10th Cir. 2009).

A court liberally construes a pro se pleadings and applies "less stringent standards than formal pleadings drafted by lawyers." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007). However, the court "will not supply additional factual allegations to … construct a legal theory on a plaintiff's behalf." *Whitney v. New Mexico*, 113 F.3d 1170, 1173–74 (10th Cir. 1997).

The court cannot be a pro se litigant's advocate, *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991), and will not accept as true conclusory allegations unsupported by factual allegations. *Oxendine v. Kaplan*, 241 F.3d 1272 (10th Cir. 2001).

## MOTIONS TO STRIKE

Defendants have moved to strike two of plaintiff's filed documents, alleging they are not permitted by the local rules: 1) plaintiff's affidavit (Dk. 82) filed separately from plaintiff's response to defendants' summary judgment motion; and 2) plaintiff's "second response" to defendants' motion to strike plaintiff's affidavit. Plaintiff counters that his affidavit was filed in response to defendant's reply brief, which pointed out that Plaintiff's response lacked evidentiary foundation.

This court's local rule regarding motions allows the movant to file a motion accompanied by a brief or memorandum, requires the opposing party to file a response in opposition to the motion, and permits the movant to file a reply brief or memorandum. *See* D. Kan. Rule 7.1. There is no provision in the local rules for filing any other responses, replies, or surreplies (meaning a reply to a reply). Consequently, the filing of such documents is not permitted without leave of court. Defendants contend that plaintiff's two documents challenged above are in the nature of surreplies, and since leave of court was neither sought nor granted, should be stricken.

The court will consider the contents of the plaintiff's affidavit and

4

second response, primarily because the court affords *pro se* plaintiffs some degree of latitude with respect to those procedural rules which are designed primarily for the court's convenience. Defendants assert no prejudice from plaintiff's unauthorized filings. Additionally, the court prefers to decide civil cases on their merits where possible, instead of ruling based on a party's procedural failure to present any factual material in support of one's opposition, as would be the case if plaintiff's affidavit were stricken. *See* D.Kan. Rule 56.1(d) ("All facts on which [an] opposition is based must be presented by affidavit ... made on personal knowledge and by a person competent to testify to the facts stated that are admissible in evidence.")

The Court has granted the plaintiff much leeway in permitting him to file multiple responses to defendant's motions instead of striking them as outside the briefing boundaries established by the rules, but the Court will not exempt plaintiff from other substantive rules which are designed to achieve fundamental fairness to all parties. For example, the court will not assume that a plaintiff can prove facts that have not been alleged, or that a defendant has violated laws in ways that a plaintiff has not alleged. *Drake v. City of Fort Collins*, 927 F.2d 1156, 1159 (10th Cir. 1991).

**MOTIONS FOR APPOINTMENT OF COUNSEL**

Plaintiff has filed multiple motions to appoint counsel, several of which are pending. Plaintiff contends that he has tried diligently to find counsel, that he has no legal training, that he suffers from stress or other mental

issues, that this is a complex and meritorious case, and that he needs counsel to counter the false affidavits filed by defendants.

Under 28 U.S.C. § 1915(e)(1), a district court may, in its broad discretion, appoint counsel to an indigent party in a civil case, *Williams v. Meese*, 926 F.2d 994, 996 (10th Cir. 1991), but civil litigants enjoy no constitutional right to an attorney, *Johnson v. Johnson*, 466 F.3d 1213, 1217 (10th Cir. 2006) (per curiam). The Court will seek volunteer counsel for a *pro se* plaintiff only if the following factors so warrant: (1) the merits of the litigant's claims, (2) the nature of the factual issues raised in the claims, (3) the plaintiff's ability to present his claims, and (4) the complexity of the legal issues raised. *Rucks v. Boergermann*, 57 F.3d 978, 979 (10th Cir. 1995) (citing *Williams*, 926 F.2d at 996). *See McCarthy v. Weinberg*, 753 F.2d 836, 837 (10th Cir. 1985)(requiring appointment of counsel in complex case where the plaintiff was mentally and physically disabled and lacked the capacity to investigate and develop crucial medical testimony); *Rucks*, 57 F.3d at 979.

The record reflects that the issues before the court are neither factually nor legally complex. Plaintiff writes clearly, has presented the issues cogently, and has repeatedly demonstrated his ability to file motions, to seek and obtain amendments to his complaint (adding both claims and parties), and to follow most procedural rules. Further, the Court is not convinced of the merits of plaintiff's claims, as noted below. Because plaintiff

fails to show that he has a colorable claim but lacks the capacity to present it, his motions for appointment of counsel shall be denied.

**SUMMARY JUDGMENT MOTION**

### § 1983 cases, generally

"To state a claim under section 1983, plaintiff must allege the violation of a right secured by the Constitution and laws of the United States … committed by a person acting under color of state law." *American Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 49–50 (1999); *Northington v. Jackson*, 973 F.2d 1518, 1523 (10th Cir. 1992). "Because vicarious liability is inapplicable to … § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Ashcroft v. Iqbal*, ___ U.S.___, 129 S.Ct. 1937, 1948 (2009); *Gallagher v. Shelton*, 587 F.3d 1063, 1069 (10th Cir. 2009). A plaintiff who has adequately identified defendants and described their acts in a § 1983 complaint must also allege facts showing a federal constitutional violation, not merely inappropriate action.

### Excessive force

Plaintiff contends that Deputy Polson violated plaintiff's constitutional right to be free from cruel and unusual punishment by using excessive force against him in May of 2005. Because the petition alleges discrete acts, the court addresses the relevant facts separately, in the context of the legal claims made by the plaintiff.

7

**Undisputed Facts**

After being convicted of aggravated battery by a jury in Johnson County District Court on May 2, 2005, plaintiff was taken into the Sheriff's custody the following day. At approximately 5:30 p.m. on May 8, 2005, plaintiff began yelling, kicking his cell door, and using an in-cell emergency call button to demand he speak with the sheriff and the district attorney. Plaintiff was subsequently moved to cell 1E-3 in the booking lounge for closer observation, where he was examined by Nurse Balfour. She saw that plaintiff was sweating profusely and referred plaintiff to see a psychologist because he told her that he saw the Russian mafia strangle his criminal defense attorney; that "they" were going to kill him by midnight; and that the district attorney "was in on it."

Dr. Ross evaluated the plaintiff the following morning and suspected plaintiff's paranoid and delusional ideation was caused by withdrawal from certain drugs, and that his ideation was exacerbated by plaintiff's abuse of a drug. Shortly thereafter, plaintiff was moved to a special management module, per Dr. Ross' recommendation for further observation.

The next morning, on May 10, 2005, at approximately 9:00 a.m., plaintiff began to yell continuously, creating a disturbance, and refused to stop after several warnings. He was eventually placed in a safety cell without incident, and a 15-minute watch was begun to verify his health and safety. Plaintiff refused a meal tray at lunch and continued to yell or talk to

imaginary people throughout much of the day.

Deputy Polson assumed duties at 4:00 p.m. on May 10, 2005, in the module plaintiff was in. That afternoon, Polson also observed plaintiff constantly talking to imaginary people and occasionally pushing and banging his cell door. He also noted that plaintiff refused dinner and something to drink. At approximately 6:45 p.m., Nurse Balfour entered the module to dispense medications and to assess plaintiff. Plaintiff was "very shaky," and refused to place his arm through the food-pass door so she could put the blood pressure cuff on his arm. At Polson's request, Deputy Brownlee came to the module to assist with the procedure. When Deputy Brownlee responded, plaintiff's cell door was opened. Plaintiff stepped forward and the nurse took his blood pressure. But when the nurse was preparing to give plaintiff his blood pressure medication, plaintiff became very anxious. Plaintiff was unrestrained at the time and in the threshold of his cell when he stated: "I need to get out of here . . . Is this six? . . . I need to go to the day room, I can't be in here!" At this point, some of the facts are controverted.

### Polson's version

Deputy Polson verbally directed plaintiff to back up into his safety cell, but plaintiff refused to follow the directive. Instead, he attempted to shove his way past the nurse and the two officers. Nurse Balfour backed out of the way. As plaintiff was pushing past the two officers, Deputy Polson grabbed plaintiff's right arm and Deputy Brownlee grabbed Plaintiff's left arm. Plaintiff

9

then managed to turn his body sideways and grab the handle of the cell door. Polson pulled plaintiff's hands off the door handle as plaintiff yelled "No! No!" and kicked the cell door shut.  To get control of plaintiff, Deputy Polson decided to take the inmate to the ground. At the time, Polson was behind plaintiff on his right side. Plaintiff had just released the cell door handle and his right arm was in front of his stomach. Polson's left hand and forearm were pressing against the back of plaintiff's right shoulder and tricep. Polson's right hand was grasping plaintiff's right forearm next to the wrist. Polson maintained this grip and dropped to his knees, forcing plaintiff down with him as he went. To maintain control of plaintiff's right arm, Polson kept plaintiff's shoulder area at about the same level with his own waist as they went to the floor. During this time, Polson did not have full control over plaintiff's right side and was struggling to control plaintiff's right arm, which was under his chest.

Plaintiff broke his fall by landing on his right arm and his chest. Polson does not recall seeing or hearing plaintiff's head strike the floor. On the floor, plaintiff was still struggling and resisting the officer's attempts to physically control him. Polson put his right knee on plaintiff's right shoulder and called on his radio for a response team to help control plaintiff. Polson then tried to pull plaintiff's right arm out from below him and pull it around behind plaintiff's back to be handcuffed. Polson told Deputy Brownlee that he didn't think his radio call went out. However, Brownlee was fully engaged in

10

trying to control Plaintiff as well, and could not make a radio call for help. The nurse then made a second radio call for officer assistance. At this time, Polson was able to pull plaintiff's right arm out from under his stomach and around behind his back to be handcuffed. Similarly, Deputy Brownlee was also able to pull plaintiff's left arm up behind his back to be handcuffed. Brownlee handcuffed plaintiff's left wrist, then his right, as Polson held plaintiff's right arm. Polson then announced over the radio that plaintiff had been placed in handcuffs.

Plaintiff was screaming that he could not breathe, so Polson rolled plaintiff off of his stomach and onto his left side, and instructed him to breathe and relax. The response team arrived, and they had plaintiff stand up and returned him to his safety cell. Plaintiff asked for water and Polson gave him a cup of water then, as well as several more cups of water upon plaintiff's request within the few hours following.

The nurse looked at the laceration on plaintiff's nose when he was returned to his safety cell, and gave him some sedatives to help him calm down. Plaintiff suffered only a small cut on the bridge of plaintiff's nose, and the blood the janitor cleaned up off the floor was one drop, 1/4 inch in size. The Sheriff's office report states its "reason for subject control" is "to restrain for Subject's safety." Dk. 78, Exh. 6a. It describes plaintiff's injury as: "laceration to bridge of nose." *Id.* For fifty-one weeks, until May 1, 2006, plaintiff did not complain about any use of force or any injuries he allegedly

11

suffered as a result of this event.

**Plaintiff's version**

Plaintiff asked Polson if he could sit in the dayroom. Plaintiff wanted to move from his cell because it had no window, bed, desk or blanket, and he was suffering anxiety attacks since the prison health service had not provided his doctor-ordered medications. Plaintiff had no violent or escape history, and the reports by the JCADC staff show no indication that he was either a physical or escape threat at any time. Plaintiff had not slept or eaten for days.

Polson attacked plaintiff from behind while plaintiff's hands were still on the cell door, tore his hands from the door handle and threw him to the ground. Polson, who weighed 450 pounds, slammed Green's face onto the concrete floor so hard that plaintiff's head literally bounced off the floor, causing a gash across the bridge of the plaintiff's nose which bled profusely and had to be cleaned up by a janitor. Polson then sat on plaintiff's shoulders, crushing the air out of him.

At no time was a nurse present. Rather, the nurse was called in after the fact. When he was returned to his safety cell, the cut on his nose was still bleeding. The nurse checked it then said she would have to go to medical to get additional supplies for it.

As a result of Polson's acts on May 10, 2005, plaintiff suffered a

contusion.[1] His face was x-rayed on May 31st, but no fractures were shown. Plaintiff's eyes were black and blue for weeks after the incident, and he was in extreme pain. Thereafter, plaintiff complained of nausea, blurred vision, ringing in the ears, sweating, vomiting and dizzy spells. Plaintiff states he first reported these symptoms when farmed out to Lyon County on June 6, 2005, and thereafter when farmed out to other county jails, but does not show the court any such reports. Plaintiff states he reported dizzy spells while housed at the JCADC on 15 dates beginning on 8/29/05, and ending on 5/26/06.[2] Plaintiff first believed that his dizzy spells were caused by his "concussion" after he was seen by Dr. Nancy Hammond, who reviewed his MRI, EEG and CT Scan, then diagnosed "post-concussive vertigo," among other conditions, on Dec. 11, 2006.[3]

**No Video**

No video tape of the incident is included in the record. Plaintiff finds this suspicious because he states he previously saw a video of another incident recorded by the jail video camera system, and was told the video tape would be kept for a period of two years. He was also told all incidents

---

[1]Plaintiff refers to this as a concussion, but the medical records reflect the diagnosis of a contusion, not a concussion. Dk. 78, Exh. 8c.

[2]Exhibits reflect plaintiff's report of "dizzy spells" to PHS on October 3, and 28, 2005, 11/09/05, 12/19/05, 8/22/06. Dk. 78, Exhs. 10-11.

[3]*See* Dk. 78, Exh. 11a.

which occurred in the jails were video taped. Plaintiff does not state the basis for such knowledge or reveal who told him such information.

In contrast, defendants produce admissible evidence that although a security camera was in plaintiff's cell and in his cell module in May of 2005, those cameras were part of a closed circuit security system which displayed an image at a remote terminal but had no recording capabilities. Dk. 80, Exh. I. Consistently, the Sheriff's office report of this incident asks: "Incident Videotaped?" and the response: "no" is checked. Dk. 78, Exh. 6a. Accordingly, the court finds no negative inference arising against defendants from the lack of a video recording of the incident.

### Discussion

The core judicial inquiry when a prisoner alleges that prison officers used excessive force against him in violation of the Eighth Amendment's prohibition of cruel and unusual punishment is not whether a certain quantum of injury was sustained, but rather whether force was non-trivial and was applied in a good-faith effort to maintain or restore discipline, or in a malicious and sadistic manner to cause harm. *Wilkins v. Gaddy*, __ U.S. __, 130 S.Ct. 1175, 1179 (2010), *citing Hudson v. McMillian*, 503 U.S. 1 at 7 (1992). In contrast to deliberate indifference claims, excessive force claims do not require serious injury as an element. *Wilkins*, 130 S.Ct. at 1178. The presence or absence of serious injury is relevant to the inquiry regarding excessive force, however, because the extent of injury may provide some

14

indication of the amount of force applied. *Id. See Marshall v. Milyard*, 415 Fed.Appx. 850 (10th Cir. 2011) (affirming dismissal of claim where complaint alleged only areas of redness and bruising indicative of *de minimus* force, insufficient to support an Eighth Amendment claim).

The court applies both a subjective and an objective test in examining excessive force claims.

> An Eighth Amendment claim involves two prongs: (i) an objective test that asks whether the alleged wrongdoing was harmful enough to constitute the unnecessary and wanton infliction of pain and (ii) a subjective test that asks whether the official acted with a "sufficiently culpable state of mind." *See id.; Serna v. Colo. Dept. of Corr.*, 455 F.3d 1146, 1152 (10th Cir. 2006); *Smith*, 339 F.3d at 1212. …The first test examines the nature and extent of the force used in light of contemporary standards of decency. *See Hudson*, 503 U.S. at 9. The second test asks "whether force was applied in a good-faith effort to maintain or restore discipline or maliciously and sadistically to cause harm." *See id.* at 6–8; *Smith*, 339 F.3d at 1212. Although treated as separate inquiries, the analysis under each test is informed by the other. *See Hudson*, 503 U.S. at 9.

*Smith v. Nichols*, 2011 WL 996871, 5 (D.Colo. 2011).

The court balances the need for application of force with the amount of force used. *Mitchell v. Maynard*, 80 F.3d 1433, 1440 (10th Cir. 1996). Courts are to consider various factors, including the degree of the injury suffered by the inmate, the need for application of force, the relationship between that need and the amount of force used, the threat reasonably perceived by the official applying the force, and whether the official employed any means to temper the severity of a force. *See Hudson*, 503 U.S. at 7 (*quoting Whitley*

*v. Albers*, 475 U.S. 312, 321 (1986)).

Here, Polson caused the bridge of plaintiff's nose to hit the floor with enough force to cause it to bleed. Some blood got on the floor, and a janitor came to clean it up, but no allegation is made that any blood got on plaintiff's clothes, on anyone else, or on plaintiff's cell, as would have been the case had profuse bleeding continued after he was handcuffed. Although the amount of blood lost is disputed, the bleeding was of short duration. Nor has plaintiff shown that he requested or required medical attention beyond the minor care rendered by the nurse in his cell, until his face was x-rayed over 20 days after the incident. The extent of plaintiff's injury is not so great as to indicate that an unnecessary amount of force was applied.

The need for some use of force is apparent. Although plaintiff claims that he was unjustly attacked from behind while his hands were still on the handle to his cell door, he does not dispute that he was in that position, outside his safety cell, because he had refused to obey the officer's direction to back up into his cell, had kicked his cell door shut, had yelled "no" in response to Polson's grabbing his arm, and had tried to shove his way past two officers. Plaintiff was under fifteen-minute watch, was unrestrained, was agitated, was non-compliant with the officer's directive, and was outside his safety cell. Polson tried unsuccessfully to obtain plaintiff's voluntary cooperation before resorting to force.

The amount of force used was reasonable in light of the need for

16

restraint. Polson grabbed and twisted plaintiff's hand or arm, forced him to the floor, and subdued him for the purpose of handcuffing him and awaiting officer assistance. That the two officers trying to restrain the plaintiff felt the need to call for a response team indicates the need for force. Polson reasonably perceived that plaintiff posed a safety threat to himself or others, and restrained plaintiff to the extent necessary to achieve physical control over him, until the plaintiff was able to regain his self-control. Nothing indicates that Polson would have been able to restrain plaintiff by using any less force than he actually used.

No malicious or sadistic motivation can be shown, based upon the uncontroverted facts. When plaintiff yelled that he could not breathe, Polson responded by rolling plaintiff onto his side, and instructing him to breathe and relax. After the response team arrived and plaintiff reentered his cell without further incident, Polson responded to plaintiff's requests for water. Nothing before, during, or after the incident evidences any ill will from Polson toward plaintiff. No question of material fact is raised that Polson's acts were anything but a good-faith effort to maintain and restore discipline. In short, the facts, viewed in the light most favorable to the plaintiff, are insufficient to satisfy either *Hudson's* subjective test or its objective test. Summary judgment is therefore warranted on this claim.

**Dental floss**

Plaintiff next contends that Major Cortright and Deputy Pierucci

17

violated the Eighth Amendment by their deliberate indifference to his requests for dental floss.

**Facts**

During plaintiff's incarceration with JCADC from May 3, 2005 to September 29, 2007, plaintiff was seen by Dr. Kahler, a licensed dentist at the JCADC, five times, and refused to visit the dental clinic twice.

On October 31, 2005, Dr. Kahler examined plaintiff's teeth and prescribed Peridex, an oral rinse used to prevent gingivitis, once a day for thirty days. On January 20, 2006, plaintiff complained that he was having severe gum bleeding issues. On February 11, 2006, plaintiff complained that, despite brushing twice per day and using Peridex, he was suffering a buildup of plaque and tartar, and had slight bleeding of the gums form time to time. On February 15, 2006, Dr. Kahler examined plaintiff's teeth and advised plaintiff that his teeth were merely stained and that this discoloration was not the result of plaque or tartar buildup. Plaintiff refused to see the dentist on March 10, 2006. Dr. Kahler noted that he would not prescribe the dental rinse again until he could examine plaintiff's periodontal conditions.

On March 14, 2006, Dr. Kahler conducted a periodontal probing of Plaintiff's teeth and gum tissue, and prescribed Peridex rinse for plaintiff's use once per day for thirty days. On July 18, 2006, Dr. Kahler examined and cleaned plaintiff's teeth. On September 27, 2006, plaintiff requested medical

18

care because of bleeding in the gum line. Plaintiff refused to visit the dental clinic on December 26, 2006. On February 20, 2007, Dr. Kahler examined and cleaned plaintiff's teeth, without problems. He also did a periodontal probe of plaintiff's gum tissue, which measured the depth of the pockets between plaintiff's teeth and gums, and found plaintiff's gum tissue to be normal and healthy.

On February 22, 2007, Dr. Kahler entered an order permitting plaintiff to floss once per day. On February 23, 2007, plaintiff was brought down to the clinic[4] and was offered floss which was between four and five inches long. Plaintiff refused, claiming the floss was too short. Plaintiff refused floss from February 23-26th. Plaintiff complained to Major Cortright, who approved dental floss which was six or six and ½ inches long.

Plaintiff states that when he was first given the longer floss, he was locked in a small one-room cell in the clinic and was not let out for over an hour. When he was finally let out, Officer Pierucci said, "You don't own the jail," then wrote plaintiff up for excessive use of the call button, which plaintiff believes was in retaliation for his flossing. Plaintiff admits he used the call button once during the hour because he wanted to ask why he had been left the cell for so long, as he had severe anxiety disorder and

_____

[4]Plaintiff was not allowed to have the longer dental floss in his cell due to safety and security reasons. (Dk. 73, Exh. E.) Plaintiff believes this reason is illegitimate.

19

defendants knew that leaving him in an enclosed space without a window would cause him emotional trauma. Plaintiff states that Deputy Pierucci did not come to the cell or speak to the plaintiff before he was finally allowed to leave.

Thereafter, plaintiff was offered the longer floss on February 26, 2007; March 1, 2007; March 2, 2007;March 5, 2007; March 6, 2007; March 7, 2007; and March 8, 2007. Plaintiff states he did not return to floss after the 26th because he did not want to subject himself to more retaliation by the staff when forced to floss at the clinic. Dk. 82, p. 4. Defendants show reports that plaintiff told staff the dental floss was too short or demanded that it be provided to him in his cell, then refused to floss when those desires were not met. Dr. Kahler discontinued his order for dental floss for plaintiff on March 8, 2007, citing plaintiff's repeated refusals to use the floss.

A toothbrush and toothpaste were available for plaintiff's purchase and use during his incarceration, and were also available if plaintiff was indigent and could not pay for them. During this incarceration, plaintiff admits that he brushed his teeth twice per day and used Peridex dental rinse when it was available to him. The parties dispute whether flossing teeth in addition to brushing them is merely a preventative measure or is a necessary measure to maintain satisfactory health and hygiene.

Plaintiff was subsequently re-incarcerated with the Johnson County Sheriff from August 30, 2010 through November 9, 2010. No detention

20

center medical records, dental records, inmate communication forms or

other complaints from that time indicate that plaintiff had dental or

periodontal diseases, conditions or deterioration. Plaintiff did not see, or ask

to see, the dentist during that incarceration.

**Discussion**

Because plaintiff was a convicted inmate when he was allegedly denied

dental floss, his claim is addressed under Eighth Amendment standards.

> A claim for inadequate medical attention will be successful if the plaintiff shows " 'deliberate indifference to serious medical needs.' " *Estate of Hocker v. Walsh*, 22 F.3d 995, 998 (10th Cir.1994) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976)). The Supreme Court cautioned that "an inadvertent failure to provide adequate medical care" does not rise to a constitutional violation. *Estelle*, 429 U.S. at 105-06, 97 S.Ct. 285.

*Martinez v. Beggs*, 563 F.3d 1082, 1088 (10th Cir. 2009). Possible latent

harms to health do not, without more, rise to the level of a serious medical

need. *Clemens v. Bohannon*, 956 F.2d 1523, 1527 (10th Cir. 1992).

Mere disagreements with a physician or dentist's care and treatment

do not rise to the level of a constitutional violation.

> An Eighth Amendment violation requires both a sufficiently serious medical need and deliberate indifference by the health-care provider. *See Estelle*, 429 U.S. at 106, 97 S.Ct. 285. Disagreement with a doctor's particular method of treatment, without more, does not rise to the level of an Eighth Amendment violation. *See id.; Johnson v. Stephan*, 6 F.3d 691, 692 (10th Cir. 1993).

*Gee v. Pacheco*, 627 F.3d 1178, 1192 (10th Cir. 2010). A medical need is

sufficiently serious "if it is one that has been diagnosed by a physician as

mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Hunt v. Uphoff*, 199 F.3d 1220, 1224 (10th Cir. 1999) (quoting *Ramos v. Lamm*, 639 F.2d 559, 575 (10th Cir. 1980)).

Plaintiff has failed to show a sufficiently serious medical need for dental floss. In fact, denial of dental floss has been cited by those who enacted the Prison Litigation Reform Act (PLRA) as a classic example of a frivolous claim.

> … the legislation was aimed at prisoners who "file free lawsuits in response to almost any perceived slight or inconvenience." *Id.* (statement of Sen. Kyl). Examples of such frivolous lawsuits presented by the Senators included: …a bad haircut given by a prison barber … being served chunky instead of creamy peanut butter …  and being denied dental floss.

*Royal v. Kautzky*, 375 F.3d 720, 730 (8th Cir. 2004) (noting "the legislative history of the PLRA shows a clear legislative intent to decrease the number of frivolous lawsuits filed by inmates.")

 Further, plaintiff has not shown a material denial of dental floss, since he was repeatedly offered floss under reasonable restrictions and refused. Nor has he shown any harm flowing from any denial of dental floss, as his subsequent dental health has not been shown to have suffered at all, let alone suffered as a result of defendants' denial of dental floss during his incarceration in 2006-2007.

Additionally, there is no evidence that Major Cortright, Deputy Pierucci,

or Sheriff Denning[5] took any acts that were deliberately indifferent to plaintiff's dental needs. The record does not show that any individual defendant was unresponsive to plaintiff's dental needs, or denied or delayed his access to dental care, or intentionally interfered with the dental treatment prescribed for him by the dentist. As prison staff, defendants were entitled to rely on the dentist to provide the dental care plaintiff needed. *See Taylor v. Vicky*, 337 Fed. Appx. 412, at *3 (5th Cir. 2009) (no proof of deliberate indifference where correctional officers knew that plaintiff's injury had been reported and assumed that the prison medical staff would manage the inmate's care); *Wall v. Dauphin County*, 167 Fed. Appx. 309, at *2 (3rd Cir. 2006) ("[i]f a prisoner is under the care of medical experts, a non-medical prison official will generally be justified in believing that the prisoner is in capable hands"); *Heard v. Sheahan*, 148 Fed. Appx. 539, 540-41 (7th Cir. 2005) (noting that jail administrators are generally entitled to rely on the judgment of medical professionals because the question of whether a particular medical treatment is warranted is a classic example of a matter for medical judgment.). The record shows that plaintiff requested and received dental care, and requested and received dental floss, but refused to

---

[5]Plaintiff does not appear to contend that Deputy Polson had any involvement in this claim. To the extent he may so contend, the court finds no personal involvement or acts by Deputy Polson or any other individual cited in the record that were deliberately indifferent to plaintiff's dental needs.

use it under the conditions reasonably imposed by JCADC. No reasonable jury could find that the individual defendants violated plaintiff's Eight Amendment rights with regard to his dental floss.

**Mail**

Lastly, plaintiff contends that Major Cortright , Deputy Pierucci, or others mishandled plaintiff's incoming legal mail by opening it outside plaintiff's presence.[6] Defendants admit that on one occasion, December 29, 2006, a letter marked as "legal mail" and addressed to plaintiff was opened by a programs officer, but was not read. Instead, the officer immediately delivered the letter to plaintiff, explained her mistake, and was swiftly counseled about the situation to prevent its recurrence.

Defendants contend that no other legally privileged mail was opened outside of plaintiff's presence.[7] Plaintiff contends that his "legal mail" was opened and read on numerous unspecified occasions.[8] The record reflects

---

[6]Plaintiff's brief states, however: "At no time has the plaintiff claimed that either Cortright or Pierucci have (sic) personally been involved with the opening or reading of his legal mail. But rather, the plaintiff has filed numerous complaints giving specific dates, time and persons involved in each occurrence." Dk. 76, p. 7.

[7]Legal correspondence to or from one's attorney is privileged, but legal pleadings or other matters of public record are not privileged.

[8]Plaintiff has not clarified which constitutional right he believes defendants violated with respect to his mail, but appears to believe that his right to privacy has been violated. But an inmates' right to privacy generally yields to the penal institution's need to maintain security. *Cumbey v. Meachum*, 684 F.2d 712, 714 (10th Cir. 1982).

several grievances filed by plaintiff about his mail, *see* Dk. 15 exhibits, but does not establish that any privileged or confidential document was opened or read, other than on the one instance admitted by defendants, noted above.

The Tenth Circuit holds that, "In the case of unprivileged incoming and outgoing prison mail, regulation by prison officials is 'essentially an administrative matter in which the courts will not intervene.' " *United States v. Gordon*, 168 F.3d 1222, 1228 (10th Cir. 1999) (quoting *Wilkerson v. Warden of U.S. Reformatory, El Reno*, 465 F.2d 956 (10th Cir. 1972). Privileged mail, such as correspondence with designated public officials, and the prisoner's attorney, for certain purposes, triggers a narrow exception. *See LeVier v. Woodson*, 443 F.2d 360 (10th Cir. 1971). *Cf Thornburgh v. Abbott*, 490 U.S. 401 (1989) (adopting different standard of First Amendment review for incoming as opposed to outgoing prison mail).

The record establishes that the incoming mail at issue was sent from the Johnson County Clerk's office by inter-office mail, rather than by USPS. An affidavit by the Clerk of the Court during plaintiff's incarceration establishes the following: pleadings, motions, responses and replies were the only types of documents that personnel from the court clerk's office filed and returned to plaintiff; the only other documents they sent to plaintiff were documents plaintiff sent to be filed which were returned because they did not meet filing requirements; none of plaintiff's cases was sealed; and,

they sent plaintiff no confidential documents from a judge or from plaintiff's attorney. Dk. 73, Exh. F.

Sergeant Steven Mailand's affidavit establishes the manner in which such mail was transported and delivered to inmates at JCADC. During 2006 and 2007, legal documents were returned from the state district court clerk to inmates at the JCADC by a Sheriff's deputy. A programs officer from the Sheriff's Office would pick legal documents up from the court clerk's office and take them across the street to the detention center for delivery to inmates. Most of those documents were returned in a large, manilla, reusable, inter-departmental envelope which held several documents. Some documents were in their own envelopes, most of which were sealed and marked 'legal mail,' and came from the inmate who sent them to the clerk. At least one of the documents plaintiff filed or sent to be filed in a state court case was returned from the district court clerk in an open unsealed envelope.

At the detention center, the documents received from the court clerk's office were taken out of the inter-departmental envelope and forwarded to the respective inmate. For safety and security purposes and to reduce costs and expenses, the inter-departmental envelope did not accompany the document, but was re-used by officers. Several of the documents plaintiff filed with the state district court clerk during the years 2006 and 2007 were returned by way of a reusable, inter-departmental envelope. If those

26

documents were not further contained in a separate, sealed envelope marked as 'legal mail,' they were opened and delivered to plaintiff without an envelope. Dk. 73, Exh. B.

Plaintiff contends that his legal mail should have been delivered to him in the envelope it was sent in, that defendants are at fault in opening the envelopes despite their knowledge that legal mail was enclosed therein, and that they read his mail to determine its contents regarding his lawsuit against them. Dk. 76, 82.

Plaintiff does not contend that anything done by defendants interfered with his communication with counsel or his access to the courts, and has not shown that his ability to pursue any legal claim was hindered as a result of the improper processing of his mail. The record shows that on one occasion, one piece of plaintiff's privileged legal mail was inadvertently opened. But a single incident of a prison official opening an inmate's constitutionally-protected legal mail does not support a civil rights claim. *Smith v. Maschner*, 899 F.2d 940 (10th Cir. 1990). No other privileged mail has been shown to have been opened outside plaintiff's presence.[9] Other mail may have been outside an envelope where it could be read by the officer who delivered it from the clerk's office, but copies of unsealed documents filed of record in

---

[9]Plaintiff appears to recognize that prison officials may open an inmate's incoming legal mail to search for contraband in the presence of the inmate. *See Wolff v. McDonnell*, 418 U.S. 539, 577 (1974).

state court are not afforded any special protection because they are public

documents available for all to read. *See* KSA 45-218; *Tilzer v. Davis,*

*Bethune & Jones, L.L.C.,* 288 Kan. 477, headnote 9 (2009) (citing "the

public policy of having court records open to public scrutiny"); *State ex rel.*

*Brant v. Bank of America*, 272 Kan. 182, 195 (2001). The same is true of

documents filed in federal court. *See* D.Kan. Rule 5.4.12; *United States v.*

*McVeigh*, 119 F.3d 806, 811 (10th Cir. 1997).

Plaintiff has failed to show that any individual defendant, through this

or her own actions, has violated the Constitution. Further, plaintiff has failed

to show that any individual defendant's conduct was intentional or motivated

by a retaliatory motive. *See e.g., Simkins v. Bruce*, 406 F.3d 1239, 1241

(10th Cir. 2005) (distinguishing between intentional and negligent conduct

in right of access to legal mail claim). No evidence of improper motive has

been shown.

Under these circumstances, no constitutional violation arises, as the

Tenth Circuit has held:

> Smith does not assert that inspection interfered with his
> communication with counsel or the courts. *See LeVier v. Woodson*, 443
> F.2d 360, 361 (10th Cir.1971) (regulation of prison mail flow generally
> better left to prison officials' discretion, with exception of
> correspondence to appropriate persons about prison conditions and
> legality of conviction); *cf. Evans v. Moseley*, 455 F.2d 1084, 1087
> (10th Cir.) (prisoner's right to correspond with attorney does not
> extend to correspondence "on any subject," but only to issues
> implicating access to courts), *cert. denied*, 409 U.S. 889, 93 S.Ct. 160,
> 34 L.Ed.2d 146 (1972). Defendants admitted to opening one piece of
> Smith's constitutionally protected legal mail by accident. Such an

isolated incident, without any evidence of improper motive or resulting
interference with Smith's right to counsel or to access to the courts,
does not give rise to a constitutional violation.

*Smith,* 899 F.2d at 944. *See also Berger v. White*, 12 Fed. Appx. 768, 771

(10th Cir. April 27, 2001) (finding that a single incident of a prison official

opening an inmate's constitutionally protected legal mail does not support a

civil rights claim).

**Qualified immunity**

The defendants also assert the defense of qualified immunity, which

shields government officials from individual liability for civil damages "insofar

as their conduct does not violate clearly established statutory or

constitutional rights of which a reasonable person would have known."

*Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The court does not reach

the issue whether the law was clearly established with respect to the

defendants sued in their individual capacities, because the lack of a

constitutional violation makes it unnecessary to further address qualified

immunity. *Jicarilla Apache Nation v. Rio Arriba County,* 440 F.3d 1202, 1214

(2006).

IT IS THEREFORE ORDERED that defendants' motion for summary

judgment (Dk. 72) is granted.

IT IS FURTHER ORDERED that defendants' motion (Dk. 83) to strike

plaintiff's affidavit (Dk. 82) is denied; that defendants' motion to strike

plaintiff's second response (Dk. 93) is denied; that and plaintiff's motions for

29

appointment of counsel (Dks. 86, 90, 94 & 97) are denied.

Dated this 31st day of August, 2011.

s/ Sam A. Crow
Sam A. Crow, U.S. District Senior Judge